Filed 6/21/13  P. v. Johnson CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DARRYL RONALDO JOHNSON II,<br><br>        Defendant and Appellant. | A131027<br><br>(Solano County<br> Super. Ct. No. FCR261253) |

Defendant Darryl Ronaldo Johnson II appeals from a judgment after a jury convicted him of attempted second degree robbery (three counts), together with true findings on firearm use allegations (Pen. Code,[1] §§ 211, 664, 12022.5, subd. (a)(1), 12022.53, subd. (b) (§ 12022.53(b))), and possession of a firearm by a felon (§ 12021, subd. (a)(1)).  After a bench trial, the court found defendant's juvenile adjudication for robbery qualified as a prior strike within the meaning of the "Three Strikes" law. (§§ 211, 667, subds. (b)-(d), 1170.12, subds. (a)-(d).)  Defendant was sentenced to an aggregate term of 18 years in state prison on the current convictions, to run concurrently to a four-year term on a prior conviction for transporting controlled substances after revocation of probation.  On appeal defendant challenges his current convictions and sentences on various grounds, as well as presentence conduct credit awarded on his prior drug conviction.  We agree with defendant that he is entitled to a recalculation of his presentence conduct credit on his prior drug conviction.  In all other respects, we affirm.

---

[1]        All further unspecified statutory references are to the Penal Code.

1

## FACTUAL AND PROCEDURAL BACKGROUND

The offenses and sentence enhancement allegations against defendant arose from an incident on November 28, 2008.  At a jury trial held in October 2010, the following testimony was elicited.

### A.    *The Prosecution's Case*

On the morning of November 28, 2008, Eduardo Gonzalez was working in his market in Dixon.  Also in the market were Evelia Ramirez and Edward Hernandez.  Shortly after 8:00 a.m., a man entered the market and first walked toward Hernandez.  The man's face was covered with a white material or tee shirt, he wore gloves, and he held a gun.  The gunman pointed the gun at Hernandez's torso and said in slang and accented Spanish, "Give me the money."  Hernandez replied in English that he had no money.[2]  The gunman then walked toward Ramirez, and pointed the gun at her midriff and touched her stomach.  The gunman said in English, "Give me money.  Give me money."[3]  Before Ramirez could respond, Gonzalez observed the gunman point the gun at Ramirez's stomach.  Gonzales approached the gunman and said in English, "Could I help you?  The gunman pointed the gun at Gonzalez's stomach and said in English, "The money."  Gonzalez and the gunman walked to the front of the store.  At some point, Gonzalez turned and grabbed the gun and the men wrestled for the gun.  The gunman let go of the gun and ran out of the store.  The gunman's right hand glove fell off during the struggle.[4]

---

[2]    Hernandez believed the gunman was an English-speaking person trying to speak Spanish.

[3]    Although Ramirez testified using a Spanish interpreter, when asked what the gunman, said, the witness replied in English, "Give me money."  Ramirez understood "very little" English, but she was able to understand what the gunman said in English. During cross-examination, Ramirez denied telling a police officer that she could not understand what the gunman had said to her. The defense called Police Officer Alberto Cruz, who testified that Ramirez said she could not understand the gunman's words.

[4]    The police recovered the gun, later found to be unloaded, and the glove from the store, and both items were admitted into evidence as People's Exhibits 3 and 4.

Gonzalez told Hernandez to get into his truck and follow the gunman. Hernandez complied, and followed the gunman who was on foot. Hernandez momentarily lost sight of the gunman and then saw a Jaguar car's lights come on. Hernandez followed the Jaguar as it sped through empty streets, not stopping for signs or stop lights at three intersections. Hernandez followed the Jaguar onto Interstate 80 eastbound. After Hernandez lost sight of the Jaguar, he stopped his pursuit and returned to the market.

Shortly after Hernandez ceased his pursuit of the Jaguar, 12-year veteran California Highway Patrol Officer Mark Garside was on routine patrol when he saw a Jaguar going at least 100 miles per hour in the freeway fast lane. Garside paced the Jaguar from behind for approximately one mile and then attempted to pass the Jaguar. As he began to pass the Jaguar, Garside observed the car "braking suddenly," and without signaling, the car moved rapidly across three traffic lanes with no traffic. The Jaguar's braking and lane-changing maneuver was sudden and potentially dangerous, but it was "done very smoothly." Garside activated his car lights and the Jaguar pulled over onto the shoulder of the road "in a normal fashion." Garside observed on the Jaguar's passenger front seat a white tee shirt and a glove. At trial, Garside identified defendant as the driver of the Jaguar.

Garside informed defendant he was stopped for speeding and asked him a couple of questions regarding the road's speed limit, how fast he was going, and the reason for his speeding. Defendant said the speed limit was "65" and he was going "90 to 100." He was on his way to Sacramento to see his child, whom he did not see very often. The child's mother said she wanted to go shopping, and if he wanted to see his child he needed to get there right now. The officer then asked defendant for identification, registration, and proof of insurance. Defendant complied, retrieving the car's registration from the glove box. Defendant then got out of the car and retrieved the other requested documents from the car's trunk. Garside testified that at that time of the morning, he normally looked for objective signs that a driver had been drinking or using drugs.

3

However, nothing gave the officer "even the slightest belief" that defendant had consumed any alcohol or controlled substances.[5]

While defendant sat in the Jaguar, Garside returned to his patrol car to issue a citation. Garside heard a "Be on the Lookout" radio announcement, which described the car he had just stopped. After communicating with police dispatch, Garside handcuffed defendant, did a pat search for weapons, and placed defendant in the back of the patrol car. Dixon Police Officer Ronald Willingmyre arrived at the scene and searched the Jaguar. Willingmyre secured the glove and white tee shirt, which were admitted into evidence as People's Exhibits 8 and 9.[6]

Shortly after defendant's detention, Gonzalez and Hernandez were brought to the scene of the traffic stop. Gonzalez was not able to identify defendant as the gunman because the gunman had covered his face. Hernandez said defendant was dressed in the same clothes as the gunman but the witness was unable to make a facial identification of defendant as the gunman. Hernandez identified the Jaguar as the same car he had pursued after the attempted robberies.

### B. Defense Case

Defendant testified on his own behalf. In November 2008, he was living in his father's home in Dixon, working as a cart pusher at a store, and he leased a 2003 Jaguar.

---

[5]     On cross-examination, Garside testified he did not test defendant's pulse rate, use a flashlight to observe how fast defendant's eyes reacted to light or see if defendant's eyes were dilated. In determining whether a person was under the influence of a controlled substance, the officer did "not very often" use a flashlight to see how fast a person's eyes would react to light.

[6]     Willingmyre also searched the car's trunk, finding that it was filled with a large amount of luggage. After removing the luggage, Willingmyre found an unloaded shotgun wrapped in a towel in the back of the trunk. Defendant denied ownership of the shotgun found in the car's trunk and disavowed any knowledge of that gun. Defendant recalled that on the morning of November 27 (the day before the attempted robberies), his friend put luggage in the Jaguar's trunk. Defendant did not recall seeing his friend put a towel with something wrapped inside of it in the trunk. Although the court directed an answer, defendant refused to disclose his friend's name. The jury found defendant not guilty of possessing the shotgun found in his car's trunk.

4

On November 27, defendant drove his car to a party in Dixon. He did not know the person who was hosting the party. He arrived at the party between one and two o'clock in the morning on November 28. He drank, danced, and socialized with about 12 to 15 people; he knew three of the partygoers. Defendant recalled having seven shots of Cognac because he was playing a drinking game. To his knowledge, he did not use any drugs that evening. Although he had used rock cocaine in the past, he was not using rock cocaine that evening. He never fell asleep at the party and he did not know how long he stayed at the party. His last conscious memory during the party was dancing with a girl whom he had never met before and he did not recall her name. Defendant's next memory was waking up in jail in custody.

When asked if he remembered anything that happened the morning after the party, defendant replied, "No. I was intoxicated, rendered me unconscious." Defendant had absolutely no memory of going to Gonzalez's market on the morning of November 28. He recalled that a couple of weeks earlier he shoplifted a bag of chips from the market, argued with some unknown person there and left. Defendant had no memory of driving his car, being pulled over, or talking to the patrol officer on November 28. After listening to the testimony in court, defendant did not recall anything that happened on November 28 nor did he recognize any of the witnesses who testified in court. When asked if his current memory loss was consistent with past occasions where he was really drunk, defendant replied, "When you're under the influence of any substance, you tend to do things that a sober person would not." Defendant also testified it was not his normal practice to go into a store with his head covered and wearing gloves, or to speed or go through stop signs or stop lights when driving.

Defendant admitted he owned the gun that was recovered in the market. On November 5, 2008, he purchased the gun for $100 from someone whom he initially refused to name. After the court directed an answer, defendant said he bought the gun from "Blanco" but he did not know the man's real name or where he lived. He purchased the gun because he had been assaulted several times the previous summer and in October and on November 1, 2008. None of the assaults were reported to the police and he

5

received no medical treatment. He carried the unloaded gun in his pocket for protection "just to show."

Defendant was also questioned about his prior criminal offenses. On direct examination, he recalled that when he was 16 years of age he was in juvenile court for a criminal offense. He "shoplifted a bottle of alcohol to drink from a supermarket," argued with one of the managers, and then just left. When asked if there was some pushing involved as he left the store, defendant replied, "That was like four years ago. I really can't remember." When asked if he recalled that in juvenile court it was said he committed a robbery because of "the physical part on the way out of the store," defendant replied, "I signed a plea bargain for a robbery, but it was a shoplifting." Defendant also admitted that as an adult he possessed cocaine. When asked if he ever transported or moved it around, defendant replied, "That again, I used cocaine, and I signed a plea bargain just to get out of custody." On cross-examination, defendant admitted that on April 10, 2008, he had been convicted of violating "Heath and Safety Code section 11352(a), transportation for sale of cocaine," pursuant to a "plea bargain," and "[t]o dismiss my other counts." He was not in the business of selling cocaine, but pleaded guilty "[t]o get out of custody," and "[t]o get on with [his] family." When asked whether "on August 19, 2004, in Solano County juvenile court in case number J34849 dash 001, did you not admit a violation of Penal Code Section 211, robbery," defendant replied, "Yes, I signed a plea bargain." On rebuttal, defense counsel asked if defendant knew whether he had pleaded guilty or "admitted a petition" in the juvenile court or even if he knew what the difference was, and defendant replied, "No." Defendant recalled signing some papers about the incident, and that the store manager had tried to stop him from leaving with the alcohol, but no weapons were involved and to his knowledge, no one was injured. The parties later stipulated defendant had "suffered a prior felony conviction for violating Health and Safety Code section 11352."

6

# DISCUSSION

## I.  Jury Instructions

Defendant contends reversal is compelled based on certain instructions given to the jury.  We address each of defendant's claims of instructional error more fully below, and ultimately conclude they lack merit.

### A.  *CALCRIM Nos. 361 and 362*

Over defendant's objections, the trial court instructed the jury regarding its consideration of defendant's testimony using language in CALCRIM Nos. 361 and 362. Thus, the jury was advised that "[i]f the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence.  Any such failure is not enough by itself to prove guilt.  The People must still prove the defendant guilty beyond a reasonable doubt. [¶] If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure." (CALCRIM No. 361.)  The jury was also advised that "[i]f the defendant made a false or misleading statement before his trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself."  (CALCRIM No. 362.)

On appeal the parties present extensive arguments discussing whether the trial court should have instructed the jury using the language in CALCRIM Nos. 361 and 362. However, we need not address these arguments.  Even assuming the trial court should not have so instructed the jury, defendant has failed to demonstrate prejudicial error requiring reversal under any standard of review.  (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*); *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

CALCRIM Nos. 361 and 362 were permissive.  CALCRIM No. 361 allowed, but did not compel, the jury to find defendant knowingly failed to explain or deny evidence.

7

Similarly, CALCRIM No. 362 allowed, but did not compel, the jury to find defendant made a false or misleading pretrial statement. If the jury did not make the allowed findings, then it was advised "to disregard" the challenged instructions.[7] (*People v. Lamer* (2003) 110 Cal.App.4th 1463, 1472 (*Lamer*); see *People v. Yeoman* (2003) 31 Cal.4th 93, 130 [court presumes jury is able to understand and follow instructions].) Additionally, each challenged instruction admonished the jury that any evidence of defendant's failure to deny or explain (CALCRIM No. 361) or his false or misleading pretrial statement (CALCRIM No. 362) was not sufficient to convict, and the jury was to decide both the meaning and importance of any such evidence.

We reject defendant's arguments that the challenged instructions were prejudicial based on the prosecutor's closing arguments. During closing, the prosecutor "stressed [defendant] lied to the jury," but he did not expressly refer to CALCRIM No. 361 or otherwise focus on defendant's failure to explain or deny any evidence. The prosecutor asked the jury to consider defendant's explanation for speeding when considering his testimony that he was not guilty because he was so drunk he blacked out and was unconsciousness, noting that the evidence showed defendant gave a coherent explanation for speeding for the purpose of misleading the officer.[8] We presume the jurors treated

---

[7] Using language in CALCRIM No. 200, the trial court advised the jury, in pertinent part, that "[s]ome of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give you a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." While the quoted language in CALCRIM No. 200 "does not render an otherwise improper instruction proper, it may be considered in assessing the prejudicial effect of an improper instruction." (*People v. Saddler* (1979) 24 Cal.3d 671, 684 [discussing language in CALJIC No. 17.31 that corresponds to language in CALCRIM No. 200].)

[8] The prosecutor specifically argued that when the jurors considered defendant's explanation of his conduct — that he was so drunk he blacked out and was unconsciousness – they should also consider that when he was stopped by the police he gave an explanation as to why he was speeding, and he "has it all worked out at this point. He's conscious of 'I have been caught here. I am understanding what the officer is saying. I am not only responding to him in a totally coherent way, but in a way that I have to come up on the spot with something to explain myself away, get out of this

8

"the prosecutor's comments as words spoken by an advocate in an attempt to persuade," and otherwise followed the court's instructions regarding its consideration of defendant's pretrial statements made to Officer Garside. (*People v. Sanchez* (1995) 12 Cal.4th 1, 70.) Thus, on this record, we conclude that any instructional error was harmless. (*Lamer, supra,* 110 Cal.App.4th at p. 1473 [court held harmless error in using language in CALJIC No. 2.62[9] that corresponds to CALCRIM No. 361, where, among other things, prosecutor's closing statement made no reference to instruction or defendant's failure to explain or deny, but "provided a detailed description of all the ways in which the defendant had explained and denied his activities by *lying*"]; *People v. Rankin* (1992) 9 Cal.App.4th 430, 436 [court held harmless error in using language in CALJIC No. 2.03[10] that corresponds to CALCRIM No. 362 where defendant's false pretrial statements did not show any consciousness of guilt].)

Relying on *People v. Wiidanen* (2011) 201 Cal.App.4th 526 (*Wiidanen*), decided after his trial, defendant argues the trial court's instructions on consciousness of guilt

---

situation, perhaps get myself on the road before something more happens,' relating back to what he really is trying to get away with."

[9]     CALJIC No. 2.62 reads: "In this case defendant testified to certain matters. [¶] If you find that [a][the] defendant failed to explain or deny any evidence against [him][her] introduced by the prosecution which [he][she] can reasonably be expected to deny or explain because of facts within [his][her] knowledge, you may take that failure into consideration as tending to indicate the truth of this evidence and indicating that among the inferences that may reasonably be drawn therefrom those unfavorable to the defendant are the more probable. [¶] The failure of a defendant to deny or explain evidence against [him][her] does not, by itself, warrant an inference of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the crime and the guilt of the defendant beyond a reasonable doubt. [¶] If a defendant does not have the knowledge that [he] [she] would need to deny or to explain evidence against [him,][her,] it would be unreasonable to draw an inference unfavorable to [him][her] because of [his][her] failure to deny or explain this evidence."

[10]     CALJIC No. 2.03 reads: "If you find that before this trial [a] [the] defendant made a willfully false or deliberately misleading statement concerning the crime[s] for which [he][she] is now being tried, you may consider that statement as a circumstance tending to prove a consciousness of guilt. However, that conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide."

9

(CALCRIM No. 362) and voluntary intoxication (CALCRIM No. 3426[11]) were incompatible as those instructions advised the jury that it could infer defendant's consciousness of guilt if they found he knowingly made a false or misleading statement to Officer Garside, but it could not consider defendant's intoxication at the time he made that statement. Defendant "takes his argument one step further," contending "CALCRIM Nos. 362 and 3426 together created an 'irrational permissive inference' in violation of due process." (*Wiidanen, supra*, at p. 533.) However, even assuming defendant's failure to object in the trial court did not forfeit this claim of instructional error, we conclude any error was harmless under any standard of review. (*Chapman, supra,* 386 U.S. at p. 24; *Watson, supra*, 46 Cal.2d at p. 836.)

In *Wiidanen*, *supra*, 201 Cal.App.4th 526, the reviewing court found the trial court erred in giving the consciousness of guilt instruction (CALCRIM No. 362) with an unmodified version of the voluntary intoxication instruction (CALCRIM No. 3426), because if the jury believed the defendant made false or misleading statements, it should be allowed to consider whether defendant was intoxicated at the time he made the statements and whether his intoxication prevented him from knowing those statements were false or misleading. (*Id.* at p. 533.) "If the jury so believed, those statements would not have been probative of defendant's consciousness of guilt." (*Ibid*.) However, the *Wiidanen* court further held that in that case any instructional error was harmless (*Watson, supra*, 46 Cal.2d at p. 836), and did not violate the defendant's due process rights, because the instruction's permissive inference, i.e., defendant was aware of his guilt when he made the false statements, was reasonable "in light of the proven facts before the jury." (*Id.* at p. 534.) We find *Wiidanen* to be persuasive authority supporting an affirmance in this case.

---

[11]     CALCRIM No. 3426 advised the jury, in pertinent part: "You may consider evidence, if any, of voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with the intent to do the act required in Counts 1, 2 and/or 3, or the special findings regarding personal use in Counts 1, 2, 3, and/or 4. [¶] . . . [¶] "You may not consider evidence of voluntary intoxication for any other purpose."

10

Because CALCRIM No. 362 (consciousness of guilt), is a "permissive inference" that "leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof, it affects the application of the 'beyond a reasonable doubt' standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference. For only in that situation is there any risk that an explanation of the permissible inference to a jury, or its use by a jury, has caused the presumptively rational factfinder to make an erroneous factual determination." (*Ulster County Court v. Allen* (1979) 442 U.S. 140, 157.) Thus, "[a] permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." (*Francis v. Franklin* (1985) 471 U.S. 307, 314-315.)

Here, we conclude that reversal is not required because CALCRIM No. 362's " 'suggested conclusion,' i.e. defendant was aware of his guilt" when he made his false or misleading statements to Officer Garside, "was reasonable 'in light of the proven facts before the jury.' " (*Wiidanen, supra*, 201 Cal.App.4th at p. 534.) Defendant's defense was, in essence, that he was so intoxicated he could not form the requisite intent to commit the charged offenses of attempted robbery. The jury was instructed that if it found defendant was intoxicated at the time of the attempted robberies, it should consider that circumstance in determining whether he had the intent required for the commission of those crimes. The fact that the jury convicted defendant of the attempted robberies indicates it found defendant was not so intoxicated as to render him unable to form the required intent to commit those offenses. Consequently, if the jury found defendant made false or misleading statements to Officer Garside, its application of "the permissive inference, i.e., defendant was aware of his guilt when he made" his statements to Officer Garside, was "reasonable, and the court did not violate defendant's due process rights by giving these instructions." (*Wiidanen, supra*, at p. 534.) "For the same reason the instructions did not violate due process, the error in giving these instructions was harmless under state law," as "it was not 'reasonably probable that a result more

11

favorable to [defendant] . . . would have been reached in the absence of the error." (*Ibid.*, *Watson, supr*a, at p. 836.)

### B.     CALCRIM Nos. 223, 251, 3426

Defendant contends the trial court committed prejudicial error by failing to include in its voluntary intoxication instruction certain language in CALCRIM No. 3426, which would have informed the jury that the People were required to prove beyond a reasonable doubt that defendant acted with the specific intent for each offense in order to convict him.[12] Defendant also contends the prejudicial effect of the omitted language in the voluntary intoxication instruction was compounded by the court's failure to give, sua sponte, instructions concerning the definitions of direct and circumstantial evidence (CALCRIM No. 223[13]), and the concept of concurrence of "act and wrongful intent" (CALCRIM No. 251[14]), which would have been helpful to the jury.

---

[12]     The written instructions incorporating language in CALCRIM No. 3426, read, in pertinent part:  "You may consider evidence, if any, of voluntary intoxication only in a limited way.  You may consider that evidence only in deciding whether defendant acted with the intent to do the act required in Counts 1, 2 and/or 3, or the special findings regarding personal use in Counts 1, 2, 3, and/or 4. [¶] A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [At this point, the trial court omitted from its oral instructions (as well as its written instructions) the following recommended paragraph, which was to be repeated for each offense:  "[¶] In connection with the charge of _____< *insert first charged offense requiring specific intent or mental state*> the People have the burden of proving beyond a reasonable doubt that the defendant acted [or failed to act] with _____< *insert specific intent or mental state required, e.g., 'the intent to permanently deprive the owner of his or her property' or 'knowledge that . . .'*> .  If the People have not met this burden, you must find the defendant not guilty of _____< *insert first charged offense requiring specific intent or mental state*>."] [¶] You may not consider evidence of voluntary intoxication for any other purpose."

[13]     CALCRIM No. 223 reads: "Facts may be proved by direct or circumstantial evidence or by a combination of both.  *Direct evidence* can prove a fact by itself.  For example, if a witness testifies he saw it raining outside before he came into the courthouse, that testimony is direct evidence that it was raining.  *Circumstantial evidence* also may be called indirect evidence.  Circumstantial evidence does not directly prove the fact to be decided, but is evidence of another fact or group of facts from which you may

However, even assuming defendant's failure to object in the trial court did not forfeit these claims of instructional errors, we conclude his contentions do not require reversal as "[t]he instructions *as a whole . . .* were not misleading." (*People v. Castillo* (1997) 16 Cal.4th 1009, 1016.) " 'The correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' [Citation.] ' "The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole." ' " (*Ibid*.) Here, an examination of the entire instructions supports our conclusion that the failure to address the element of intent and the People's burden of proof as part of the voluntary intoxication instruction did not render that instruction incorrect or inadequate. As part of the voluntary intoxication instruction, the jury was told to consider such evidence in determining whether "defendant acted with the intent to do the act required in Counts 1, 2 and/or 3, or the special findings regarding personal use in Counts 1, 2, 3, and/or 4." In the instructions on the substantive elements of counts one through three (attempt and substantive offense of robbery), and the special allegations of

---

logically and reasonably conclude the truth of the fact in question. For example, if a witness testifies that he saw someone come inside wearing a raincoat covered with drops of water, that testimony is circumstantial evidence because it may support a conclusion that it was raining outside. [¶] Both direct and circumstantial evidence are acceptable types of evidence to prove or disprove the elements of a charge, including intent and mental state and acts necessary to a conviction, and neither is necessarily more reliable than the other. Neither is entitled to any greater weight than the other. You must decide whether a fact in issue has been proved based on all the evidence."

[14]     CALCRIM No. 251 reads: "The crime[s] [(and/or) other allegation[s]] charged in this case require proof of the union, or joint operation, of act and wrongful intent. [¶] For you to find a person guilty of the crime[s] (in this case/or ___ *<insert names[s] of alleged offense[s] and count[s], e.g., burglary, as charged in Count 1>* [or to find the allegation[s] of _____ *< insert names[s] of enhancement[s]>* true]), that person must not only intentionally commit the prohibited act [or intentionally fail to do the required act], but must do so with a specific (intent/[and/or] mental state). The act and the specific (intent/[and/or] mental state) required are explained in the instruction for that crime [or allegation]. [¶] *<Repeat next paragraph as needed>* [¶] [The specific (intent/[and/or] mental state) required for the crime of _____*<insert names[s] of alleged offense[s] e.g., burglary>* is _____*<insert specific intent>.*]

13

personal use of a firearm, the jury was advised of the requisite mental states that the People had to prove in order for the jury to find defendant guilty of the charged crimes or make true findings of the special allegations.[15] In addition, the court apprised the jury that whenever the instructions told the jury that the People had to prove something, it meant the People had to prove it beyond a reasonable doubt.

Defendant's related argument, premised upon the trial court's failure to give, sua sponte, CALCRIM Nos. 223 and 251, fares no better. Even assuming the trial court had a sua sponte duty to give these instructions, we discern no prejudice. Any error in failing

---

[15] Using the language in CALCRIM No. 460, the court advised the jury regarding the concept of attempt, in pertinent part: "The defendant is charged in Counts 1, 2 and 3 with attempted Robbery. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant took a direct but ineffective step toward committing Robbery; [¶] AND [¶] 2. The defendant intended to commit Robbery; [¶] . . . [¶] To decide whether the defendant intended to commit Robbery, please refer to the separate instructions that I will give you on that crime." Next, incorporating language from CALCRIM No. 1600, the court advised the jury regarding the elements of the substantive offense of robbery, in pertinent part: "The defendant is charged in Counts 1, 2 and 3 with attempted robbery. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] . . . [¶] 4. The defendant used force or fear to take the property or to prevent the person from resisting; [¶] AND [¶] 5. When the defendant used force or fear to take the property, he intended to deprive the owner of it permanently or to remove it from the owner's possession for so extended a period of time that the owner would be deprived of a major portion of the value or enjoyment of the property. [¶] The defendant's intent to take the property must have been formed before or during the time he used force or fear. If the defendant did not form this required intent until after using the force or fear, then he did not commit robbery." Drawing from the language in CALCRIM No. 3146, the court advised the jury regarding the elements of the special allegations relating to personal use of a firearm, in pertinent part: "If you find the defendant guilty of the crimes charged in Counts 1, 2, 3, and/or 4 you must then decide whether, for each crime, the People have proved the additional allegation that the defendant personally used a firearm during the commission of that crime. You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime. [¶] . . . [¶] . . . [¶] Someone *personally uses* a firearm if he or she intentionally does any of the following: [¶] 1. Displays the weapon in a menacing manner; [¶] 2. Hits someone with the weapon; [¶] OR [¶] 3. Fires the weapon. [¶] The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved."

to instruct the jury using the language in CALCRIM No. 251 (concept of concurrence of act and wrongful intent) was cured by the substantive crimes instructions, which informed the jury that a conviction required a finding that defendant acted with the appropriate intent for each crime. Similarly, any error in failing to instruct the jury using the language in CALCRIM No. 223 (definition of direct and circumstantial evidence) was cured by other instructions, which allowed the jury to properly consider the evidence. Specifically, the jurors were told they "must decide what the facts are in this case," " '[e]vidence' is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else [the court] told you to consider as evidence," "[o]nly the witnesses' answers are evidence," and "[i]n deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty." (CALCRIM Nos. 220, 222.) Additionally, the jury was advised how to use circumstantial evidence: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable." (CALCRIM No. 224.) Despite the failure to define direct and circumstantial evidence, the jury apparently understood those concepts – the jury found defendant not guilty of possessing the shotgun found in his car's trunk, thereby rejecting the prosecution's circumstantial evidence, i.e., where " 'guilt must be inferred from a pattern of incriminating circumstances.' " (*People v. Heishman* (1988) 45 Cal.3d 147, 167.) Last, the omission

15

of the language in CALCRIM Nos. 223 and 251 did not impinge on defendant's "right to due process and a fair jury deliberation process." The given instructions "made clear that the prosecution had to prove defendant's guilt, including the existence of the required mental states, beyond a reasonable doubt" (*People v. Livingston* (2012) 53 Cal.4th 1145, 1165), thereby comporting with the due process standard in *In re Winship* (1970) 397 U.S. 358, 364. Thus, we conclude instructional errors, if any, were harmless under any standard of review. (*Chapman, supra,* 386 U.S. at p. 24, *Watson, supra,* 46 Cal.2d at p. 836.)

## II. Trial Court's Refusal to Instruct on the Lesser Included Offenses of Attempted Robbery

Defendant argues the trial court violated his Sixth Amendment right to a properly instructed jury by refusing to instruct the jury on the lesser included offenses of attempted grand theft from a person, attempted petty theft, and simple assault. The trial court denied the requested instructions in light of the evidence, "specifically, the evidence that a firearm was pointed, and, in fact, touched, in some cases, the midriffs or bellies of at least two of the three alleged victims, and the fact that the defendant has no memory and he was not able to provide any other theory or any other information related to a theory of grand theft from the person or petty theft . . . ." According to the court, instructions on the requested lesser included offenses were "not required where the evidence . . . clearly indicate[d] the theory of robbery. [¶] O[f] all those cases where they had an issue with grand theft, petty theft of a person not being provided, they were really purse snatcher-type cases. There was not the opportunity for the force and fear. And that[ ] just does not fit with the factual scenario presented in this case."

On appeal the parties have presented arguments as to whether attempted grand theft, attempted petty theft, and assault, qualified as lesser included offenses in this case, but we do not need to address those contentions. Even if attempted grand theft, attempted petty theft, and assault, qualified as lesser included offenses, the trial court correctly refused to so instruct the jury as no substantial evidence supports a finding that

16

defendant did not intend to rob the victims, but only to assault or steal from them without force or fear.  (See *People v. Dorsey* (1995) 34 Cal.App.4th 694, 705-706.)

"Although a defendant has a constitutional right to have a jury determine every material issue presented by the evidence and the failure to so instruct is error, a trial court is not required to instruct the jury as to all lesser included offenses, only those that 'find substantial support in the evidence.'  [Citation.]  In this context, substantial evidence is evidence from which reasonable jurors could conclude ' "that the lesser offense, but not the greater, was committed." ' "  (*People v. Medina* (2007) 41 Cal.4th 685, 700.)  "[I]f there is no proof, other than an unexplainable rejection of the prosecution's evidence, that the offense was less than that charged, such instructions shall not be given."  (*People v. Kraft* (2000) 23 Cal.4th 978, 1063.)

Here, all of the victims in the store testified they were approached by an armed gunman who put them in fear and sought money.  Even assuming Ramirez did not understand what the gunman said, there was no evidence the gunman intended to assault her if she failed to comply with his request.  The sum and substance of the evidence relating to intoxication was defendant's self-serving testimony that some six hours before the attempted robberies he had drunk seven shots of Cognac, his last memory was dancing with an unidentified woman at a party, and his next memory was waking up in jail.  Thus, we conclude, as did the trial court, that the evidence presented to the jurors presented them with " 'an all-or-nothing choice': the jury could either find that defendant had committed the [attempted robberies] or it could find that he had committed no crime."  (*People v. Friend* (2009) 47 Cal.4th 1, 52.)

### III.  Admission of Evidence of Defendant's Prior Juvenile Robbery Offense and Adult Drug Offense

Before trial, both the prosecutor and defendant asked the court to rule on the admissibility of defendant's prior juvenile robbery and adult drug offense of transporting cocaine for sale as impeachment evidence if defendant chose to testify.  Defendant sought exclusion of the priors, while the prosecution sought their admission.  After an Evidence Code section "352 analysis,"  the trial court ruled both priors would be admissible as

17

impeachment evidence. The court explained that if defendant chose to testify, his "credibility and veracity" would be "critical issues," and the priors were "central to the ability to evaluate his credibility," and "not remote," but "recent in time." We find no error in the trial court's ruling.

On appeal defendant does not dispute that his priors constituted conduct that can be used as impeachment evidence. (See *People v. Castro* (1985) 38 Cal.3d 301, 317 [allowing use of prior possession of heroin for sale]; *People v. Jackson* (1985) 174 Cal.App.3d 260, 266 [allowing use of prior robbery]; see also *People v. Lee* (1994) 28 Cal.App.4th 1724, 1740 [the prosecution may introduce prior conduct that was "the subject of a juvenile adjudication, subject, of course, to the restrictions imposed under Evidence Code section 352 and other applicable evidentiary limitations"].) Moreover, admission of the robbery prior was not error despite any similarity to the currently charged attempted robbery offenses. (See, e.g., *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1139; *People v. Tamborrino* (1989) 215 Cal.App.3d 575, 590 (*Tamborrino*) [impeachment allowed using robbery priors identical to charged offense].) Further, the priors were not necessarily so remote in time as to be inadmissible for impeachment. "Even a fairly remote prior is admissible if the defendant has not led a legally blameless life since the time of the remote prior." (*People v. Mendoza* (2000) 78 Cal.App.4th 918, 925-926.) In this case, since the commission of the robbery prior, defendant had been convicted of transporting cocaine for sale, and committed the current offenses while on revoked probation status for the drug conviction.

We are not persuaded by defendant's argument that his priors should have been excluded because his testimony was critical to his defense. "Defendant's credibility would be the crucial issue for the People as well as for the defendant if he took the stand and denied the [attempted] robberies. . . . There were no eyewitnesses to the [attempted] robber[ies] except [the three victims who were] unable to identify defendant. The priors would be highly probative on the issue of defendant's credibility." (*Tamborrino*, *supra*, 215 Cal.App.3d at p. 590.) The fact that the jury asked to hear defendant's testimony during deliberations does not demonstrate that the evidence of the priors adversely

18

affected the verdict. During deliberations, the jury also asked to hear the testimony of CHP Officer Garside and Dixon Police Officer Willingmyre. The jury's request to rehear testimony and its verdicts, including acquitting defendant of possessing the shotgun found in his car's trunk, demonstrates the jury focused on the evidence and not the priors. Thus, we reject defendant's contention that it is reasonably probable that a result more favorable to him would have been reached had the trial court not permitted the priors to be used as impeachment evidence.

## IV.    Cumulative Errors

Defendant contends reversal is warranted on grounds of cumulative error, arguing that the errors, considered together, are not harmless beyond a reasonable doubt. We disagree. As in *People v. Cole* (2004) 33 Cal.4th 1158, " '[w]e have either rejected on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial.' " (*Id.* at pp. 1235-1236.) "[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844-845.) This is not such a case. The record demonstrates that any purported errors, considered individually or collectively, were not so prejudicial as to deny defendant a fair trial or reliable verdicts.

## V.    Sentencing Issues

### A.    *True Finding of Defendant's Prior Juvenile Adjudication*

The information alleged that on August 19, 2004, in Solano County, defendant had suffered a juvenile adjudication for "PC211," which qualified as a strike within the meaning of the Three Strikes law. At a bifurcated bench trial, the prosecutor submitted the matter based on the following documents admitted into evidence: a certified copy of waiver of rights form filed August 19, 2004; a file-stamped copy of a court minute order dated August 19, 2004, signed by the judicial officer who presided in the juvenile court; a certified copy of a court minute order dated September 2, 2004, signed by the judicial officer who presided in the juvenile court; and a reporter's transcript of the September 2, 2004, hearing. The prosecutor also asked the court to take "judicial notice" of the fact

19

that during the guilt-phase portion of the trial defendant admitted he had sustained a juvenile adjudication for robbery.

After argument by counsel, the trial court found defendant had sustained a prior juvenile adjudication for robbery in violation of section 211, which offense would qualify as a strike within the meaning of the Three Strikes law. In so ruling, the court explained: "I did see in People's Exhibit 1 [waiver of rights form], it was not signed by either the defendant or by the judge accepting the plea. However, the minutes from that same date August 19, 2004 do indicate that the written waiver was filed and orally verified, [and] indicated that the Court accepted and that there was an intelligent waiver of rights and a factual basis. [¶] Based on the totality of the documents and the presumption that the minutes are correct, I will accept that as a valid plea and intelligently received by the Court. [¶] Also notably, the date of birth is contained within that minute order, same date of birth as alleged in the Information for [defendant], and without doing the math, I'll rely on the minute order which indicates at the time of the event, he was 16 years old. [¶] Also, [defendant] did testify as to his remembrance that he had plead . . . to a 211 as a juvenile."[16]

On appeal defendant claims there was insufficient evidence to support the trial court's finding. We disagree. Contrary to defendant's contention, the trial court could reasonably rely on the admitted juvenile court documents: (a) defendant's written waiver form in case no. J034849, initialed by defendant, indicated he wished to enter an admission to counts "I (211 pc on July 4, 2004) & III 594 pc (vandalism);" (b) the juvenile court's minute order of August 19, 2004 (approved and signed by the presiding judicial officer), noted defendant's "DOB" as "9-9-87," his age as "16," and stated, in pertinent part: THE COURT MAKES THE FOLLOWING FINDINGS & ORDERS: "Allegations . . . admitted cts. 1 & 3," "**Written waiver** filed & orally verified," "Court

---

[16]    Defendant's juvenile adjudication was escalated from a shoplifting incident to a robbery based on *People v. Estes* (1983) 147 Cal.App.3d 23, in which the court found the use of force to prevent a security guard from regaining possession of property elevated a petty theft and subsequent assault to robbery. (*Id.* at p. 28.)

**accepts admission(s)** as free & voluntary with an intelligent waiver of rights given & a factual basis established," and "**Petition deemed** . . . Felony as to cts. 1;"[17] and (c) the September 2, 2004, minute order (signed by the presiding judicial officer), and the reporter's transcript of the September 2, 2004, hearing, which indicated that defendant was adjudged a ward of the court based on the petition filed in case no. J034849.

To the extent the juvenile court documents do not specifically refer to defendant's admission to a violation of Penal Code section 211 (robbery), the trial court appropriately considered defendant's guilt-phase trial testimony in which he stated that at 16 he admitted to violating Penal Code section 211, robbery, in a juvenile court proceeding held on August 19, 2004.[18] Relying on a concurring and dissenting opinion of then

---

[17] Defendant correctly notes the August 19, 2004, minute order has boxes checked for the quoted findings set forth in the text of this opinion. He then argues that "[a]lthough infrequent, court clerks have erred in checking boxes and noting court orders on minute orders," and "[w]here there is a conflict, a court's oral pronouncements reflected in the reporter's transcript of the proceedings supersede the information in a minute order." He then argues that because there is no other "documentary evidence to confirm" what the August 19, 2004, minute order "suggests," this document cannot reliably reflect an admission of robbery. We disagree. Defendant ignores the fact that the August 19, 2004, minute order is approved and signed by the judicial officer who presided at that proceeding. In the absence of any affirmative showing that the minute order does not accurately reflect what occurred in the juvenile court on August 19, 2004, we will not presume, as defendant appears to argue, that the minute order represents a clerical error, or is in conflict with the oral proceedings that occurred in the juvenile court on August 19, 2004. (See Evid. Code, § 664 [presumption that official duty has been regularly performed]; *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [judicial order is presumed correct and error must be affirmatively shown].)

[18] Defendant correctly concedes he made no objection to the prosecution's request that the court take "judicial notice" of his guilt-phase testimony on the specific ground that such evidence was not the proper subject of judicial notice under Evidence Code section 452. Further, before taking "judicial notice" of defendant's guilt-phase trial testimony, the trial court complied with Evidence Code section 455, by affording defense counsel a "reasonable opportunity . . . before the cause [was] submitted for decision by the court, to present to the court information relevant to (1) the propriety of taking judicial notice of the matter and (2) the tenor of the matter to be noticed." (*Id.*, subd. (a).) In all events, even without a request for judicial notice, the trial court could consider defendant's guilt-phase trial testimony in determining whether he had sustained a juvenile adjudication for robbery, as we discuss in the text of this opinion.

21

Associate Justice Raymond E. Peters in *Jones v. Superior Court* (1962) 58 Cal.2d 56, 62-63 (*Jones*), defendant argues that any use of his guilt-phase trial testimony made him a witness against himself and lessened the prosecution's burden of proof on the issue of the truth of the prior juvenile adjudication, which "is improper and unfair." However, *Jones* is inapposite as it concerned a prosecution's request for pretrial discovery in an attempt to benefit from the defendant's knowledge of potential evidence to be used against him at trial. (*Id.* at p. 60.) Here, we are concerned with the use of defendant's freely offered guilt-phase trial testimony to prove a prior juvenile adjudication in the bifurcated enhancement phase. Because "[b]ifurcating the trial does not create two separate actions," "when [defendant] waive[d] his privilege against self-incrimination by testifying in the guilt phase of the trial, that privilege [was] waived for the sentencing phase as well." (*People v. Harris* (1992) 8 Cal.App.4th 104, 108; see *id.* at pp. 106-107 [prosecution allowed to use defendant's guilt-phase trial admission of prior robbery conviction in bifurcated enhancement phase where fingerprint evidence was not available to prove identity for prior robbery conviction].) Contrary to defendant's additional argument, we see nothing in his guilt-phase trial testimony that calls into question the trial court's reliance on his admission to a juvenile adjudication for robbery.

In sum, we conclude defendant's guilt-phase trial testimony, together with the juvenile court documents, constituted substantial evidence to support the trial court's finding that defendant sustained a juvenile adjudication for robbery, a qualifying strike under the Three Strikes law.

### B. Denial of Defendant's Request to Strike Prior Juvenile Adjudication

For sentencing purposes, defendant asked the court to exercise its discretion, pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 508 (*Romero*), to strike his prior juvenile adjudication, which request was opposed by the prosecution. The trial court denied defendant's motion to strike, ruling as follows: "I don't think the interest of justice warrants striking the prior, and the defendant has [not] shown me in terms of his conduct on probation, his adult probation matter an[d] his conduct during the trial would warrant me to exercise that type of discretion or decision making. [¶] And

frankly, I disagree with the characterization about a career criminal. I think he has earned himself a new career."

On appeal defendant argues the trial court abused its discretion by refusing to strike his prior juvenile adjudication for sentencing purposes. We see no merit to the argument. The trial court here appropriately found defendant's situation was not so extraordinary as to warrant striking his prior juvenile adjudication for sentencing purposes. As noted in the probation department's report, defendant's escalation of a shoplifting incident to a robbery, his later commission of a serious drug offense, and his current commission of attempted robberies, demonstrated "a pattern of . . . increasingly serious criminal conduct." The trial court aptly commented that defendant's conduct demonstrated he had "a new career." The trial court acted well within its discretionary authority in refusing to treat defendant "as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

### C. Constitutionality of 10-Year Term Imposed on Section 12022.53(b) Firearm Enhancement As Applied to Defendant

In both a written memorandum and during oral argument at sentencing, defendant asked the trial court to strike the 10-year term for the section 12022.53(b) firearm enhancement as unconstitutional (U.S. Const., 8th Amend. [19]; Cal. Const., art. I, § 17[20]), as applied to him. The trial court considered defendant's arguments and understood it had the discretion to strike the enhancement as unconstitutional as applied to him, but denied the request for the reasons it gave for its sentencing decisions. [21]

---

[19] "The Eighth Amendment of the United States Constitution prohibits infliction of 'cruel and unusual punishment.' This prohibition is applicable to the states by virtue of its incorporation in the due process clause of the Fourteenth Amendment." (*People v. Byrd* (2001) 89 Cal.App.4th 1373, 1382, fn. 13.)

[20] Article I, section 17 of the California Constitution provides, in pertinent part: "Cruel or unusual punishment may not be inflicted . . . ."

[21] Consequently, the Attorney General's argument that defendant forfeited appellate review of his federal and state constitutional arguments is not well founded. In his

On appeal defendant argues the imposition of the 10-year term for the section 12022.53(b) firearm enhancement was unconstitutional as applied to him. Although our review is de novo (*Felix, supra,* 108 Cal.App.4th at p. 1000), we reject, for the reasons set forth below, defendant's as-applied constitutional challenge.

"To determine whether a sentence is cruel or unusual as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including its motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including age, prior criminality, and mental capabilities. ([*Dillon*], *supra*, 34 Cal.3d at p. 479.) If the court concludes the penalty imposed is 'grossly disproportionate to the defendant's individual culpability' (*ibid.*), or, . . . that the punishment ' " 'shocks the conscience and offends fundamental notions of human dignity' " ' [citation], the court must invalidate the sentence as unconstitutional." (*People v. Hines* (1997) 15 Cal.4th 997, 1078.)

In examining the nature of defendant's current offenses, the record demonstrates he planned the robberies, wore a disguise and gloves to avoid later identification, and, as he concedes, he frightened and scared the victims in the store "when he entered and pointed a gun at each one." Defendant asks that we consider certain allegedly mitigating circumstances including that he used an unloaded gun, the victims were not injured, and no property was taken. However, the Legislature has found the personal use of a weapon during the commission of an attempted robbery is deserving of the harsh punishment of 10 years in state prison even where the firearm is not "operable and loaded" (§ 12022.53, subds. (a)(4)(18), (b)), the victims have not been physically injured, and there was no loss

written trial memorandum, defense counsel expressly argued the court should strike the section 12022.53(b) firearm enhancement to avoid imposing " 'an unconstitutional punishment' " on defendant, citing to *People v. Dillon* (1983) 34 Cal.3d 441 (*Dillon*), and *People v. Felix* (2002) 108 Cal.App.4th 994 (*Felix*). At sentencing, defense counsel renewed his argument, asking the court "to engage in the analysis that is set forth in the reported decisions" cited in his sentencing memorandum, and to strike the enhancement if the court finds "it would constitute a violation of [defendant's] 8th Amendment rights [under] the United States Constitution," and is "excessive as applied to [defendant]."

of property. (§ 12022.53, subds. (a)(4)(18), (b) [22]; see *People v. Ingram* (1995) 40 Cal.App.4th 1397, 1416 ["[t]he seriousness of the threat a particular offense poses to society is not solely depended upon whether it involves physical injury" to the victims], disapproved on another ground in *People v. Dotson* (1997) 16 Cal.4th 547, 560, fn. 8; *Rummel v. Estelle* (1980) 445 U.S. 263, 275 ["the presence or absence of violence does not always affect the strength of society's interest in deterring a particular crime or in punishing a particular criminal"].) Section 12022.53(b) "punishes the perpetrator of one of the specified crimes more severely for introducing a firearm into a situation which, by the nature of the crime, is already dangerous and increases the chances of violence and bodily injury. We conclude nothing in the nature of the offense or how it was committed allows striking the mandatory enhancement as cruel or unusual." (*Felix, supra*, 108 Cal.App.4th at p. 1001.)

Nor do we find that defendant's personal characteristics render the 10-year term unconstitutionally excessive. At the time of the current offenses in November 2008, defendant was 21 years old. Although he had never been incarcerated, defendant had been adjudicated a juvenile offender for a shoplifting incident that escalated to a robbery. As an adult, he had been convicted of transporting cocaine for sale and given a probationary term. Less than eight months later, while in revoked probation status for his drug conviction, he armed himself with a firearm and committed the current serious offenses, thereby putting the community at risk. We agree with the trial court's comments that the victims "really did suffer a traumatic event," and that defendant

---

[22]    "Section 12022.53 as a whole represents a careful gradation by the Legislature of the consequences of gun use in the commission of serious crimes. The section is limited, in the first place, to convictions of certain very serious felonies. The statute then sets forth three gradations of punishment based on increasingly serious types and consequences of firearm use in the commission of the designated felonies: 10 years if the defendant merely used a firearm, 20 years if the defendant personally and intentionally discharged it, and 25 years to life if the defendant's intentional discharge of the firearm proximately caused great bodily injury. Furthermore, the provision in question is an enhancement to the base term for the underlying conviction; a trial court retains flexibility as to fixing the underlying base term. . . ." (*People v. Martinez* (1999) 76 Cal.App.4th 489, 495, fn. omitted.)

"lack[ed] insight, responsibility, credibility, and empathy for the people whose lives he irrevocably changed by the decisions he made."

In sum, based on our independent review, we conclude the imposition of the 10-year firearm enhancement under section 12022.53(b) was neither cruel nor unusual punishment in this case.

> ### D.  *Consecutive Terms on Counts Two, Three, and Four, and Upper Term Imposed but Stayed for Section 12022.5 Firearm Enhancement*

Before sentencing, both the prosecutor and defense counsel submitted memorandums addressing sentence. The People sought an aggregate term of 18 years, eight months. Defense counsel did not proffer a specific aggregate term. Instead, he argued the court should impose the low term on count one (attempted robbery), strike the 10-year term for the section 12022.53(b) firearm enhancement as unconstitutional, and impose concurrent terms for counts two (attempted robbery), three (attempted robbery), and four (possession of a firearm by a felon).

At sentencing, the trial court stated its reasons for its sentencing choices as follows: "I previously denied the *Romero* motion. And to that extent, those comments also apply to the decision to not exercise my discretion to strike the [section 12022.53(b) firearm] enhancement, nor to run the sentences concurrent, despite [defense counsel's] invitation to do so. And part of my evaluation was public safety. I reviewed the preliminary hearing transcript . . . . [I have] considered all of the evidence, including the defendant's testimony and the probation report. And based upon the nature of the crime, which there were three victims, and the fact that the defendant was a felon in possession of a firearm, that he seemingly lacked responsibility – he's now taken an inconsistent approach with trying to be credited for making a decision not to bring a loaded firearm, which – thank goodness it wasn't a loaded firearm, or we might not be talking about an attempted robbery, given the circumstances, but yet to testify and present to the Court that he had no memory whatsoever regarding this case, that he entirely blacked out from some supposed alcohol intake the evening before, that simply lacks insight,

26

responsibility, credibility, and empathy for the people whose lives he irrevocably changed by the decisions he made. So I did not find the *Romero* motion to be appropriate. [¶] And unlike so many cases where the first strike is really, really serious, but the second case is not very serious . . ., this case is extremely serious and really does not warrant that type of leniency."

The court then imposed an aggregate term of 18 years, consisting of 14 years for count one (attempted robbery) (middle term of two years on the substantive offense, doubled for the prior strike, plus a consecutive term of 10 years for the related section 12022.53(b) firearm enhancement), plus consecutive terms of one year, four months (one-third the middle term doubled for the prior strike) for counts two, three, and four. Because defendant could not be punished for more than one firearm enhancement, the court imposed but stayed a 10-year upper term on a section 12022.5 firearm enhancement related to count one. The prosecutor dismissed the related firearm enhancements alleged as to counts two and three. Defense counsel asked the court for its reasons for imposing the upper term on the stayed firearm enhancement, "for the record." The trial court replied: "[T]here were multiple victims. And in this particular case, I found it [a] very aggravating circumstance that not only was a weapon pointed at three different people, and the person was in possession of the firearm, but also there was a point-blank range. There was testimony that the gun actually was direct[ly] located next to the . . . upper part of the belly of one of the victims . . . . [¶] So based upon the aggravated circumstances, I would find that the ten years for the [enhancement] that I am staying is appropriate." Defendant lodged no objection to the court's statement of reasons. The court also imposed a concurrent four-year term on the prior drug conviction after revoking probation on that conviction. Although the court acknowledged defendant was subject to a separate sentence for the drug conviction, it decided the sentences in the two cases should run concurrently because defendant "is a person of young age and there was quite a bit more opportunity for a greater liability. And certainly I construed it in a fashion, I think, that was fair to the victims in this case, and recognized that they really did suffer a

traumatic event, but also judicious in recognizing that [defendant] is a young man and has not previously served a prison commitment."

On appeal defendant argues the trial court abused its discretion in imposing consecutive terms on counts two and three (attempted robberies) and count four (possession of a firearm by a felon). We disagree, finding the authority on which defendant relies inapposite. Unlike the situations in *People v. Deloza* (1998) 18 Cal.4th 585, 600, and *People v. Danowski* (1999) 74 Cal.App.4th 815, 821, the trial court in this case understood that consecutive terms were not mandated as a matter of law. While the record may support a contrary finding, we see no abuse of discretion in the court's ruling that consecutive terms were warranted as the three attempted robberies constituted "separate acts of violence or threats of violence" (Cal. Rules of Court, rule 4.425(a)(2)[23]), and were not "committed so closely in time and place as to indicate a single period of aberrant behavior" (Rule 4.425(a)(3)). The trial court could reasonably find defendant's attempted robberies were separated by sufficient periods of time to give him the opportunity to reflect and to cease his criminal behavior, which he failed to do. (See *People v. Calhoun* (2007) 40 Cal.4th 398, 407-408 [trial court may impose consecutive sentences when two or more crimes are transactionally related and each involves a different victim]; *People v. Trotter* (1992) 7 Cal.App.4th 363, 368 [trial court acted within its discretion in imposing consecutive sentences for two assault convictions based on firing two shots a minute apart at the victim].) The trial court also could reasonably find defendant's possession of a firearm as a felon was "predominately independent" of the attempted robberies. (Rule 4.425(a)(1); see *People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1414 ["[c]ommission of a crime under section 12021 [possession of a firearm by a felon] is complete once the intent to possess is perfected by possession;" "[w]hat the ex-felon does with the weapon later is another separate and distinct transaction undertaken with an additional intent which necessarily is something more than the mere intent to possess the proscribed weapon"].)

---

[23]     All further unspecified rules are to the California Rules of Court.

Defendant also mounts a challenge to the sentence arguing that the trial court erred when it used the same factors to impose both consecutive terms on the substantive offenses and the upper term on the stayed firearm enhancement. However, this claim of error is not properly before us. At the time of sentencing, the trial court stated its reasons for refusing to impose concurrent terms on counts two through four. After imposing a mandatory and consecutive 10-year term on the section 12022.53(b) firearm enhancement, the court indicated it would impose but stay an upper term of 10 years on the section 12022.5 firearm enhancement. (See § 12022.53, subds. (f), (j); Rule 4.447.) [24] In response to defense counsel's request, the trial court stated its reasons for imposing the upper term on the stayed firearm enhancement. Had counsel objected to the reasons on the ground now asserted on appeal — the purported use of the same factors — the trial court could have clarified its reasons for imposing the upper term on the stayed firearm enhancement and the consecutive terms on the substantive offenses. Consequently, we reject defendant's contentions that his trial counsel did not have a meaningful opportunity to object and that any objection would have been futile. In the absence of an objection, defendant has forfeited his appellate contention. (*People v. Scott* (1994) 9 Cal.4th 331, 353.)

In all events, defendant has failed to demonstrate how he was prejudiced by the trial court's sentencing choices. (See *People v. Black* (2007) 41 Cal.4th 799, 822; *People*

---

[24] Section 12022.53, provides, in pertinent part, that "[a]n enhancement involving a firearm specified in Section . . .12022.5 . . . shall not be imposed on a person in addition to an enhancement imposed pursuant to this section [12022.53]," and "[w]hen an enhancement specified in this section [12022.53] has been admitted or found to be true, the court shall impose punishment for that enhancement pursuant to this section rather than imposing punishment authorized under any other provision of law, unless another enhancement provides for a greater penalty or a longer term of imprisonment." (*Id.*, subds. (f), (j).) Rule 4.447 reads: "No finding or an enhancement may be stricken or dismissed because imposition of the term either is prohibited by law or exceeds limitations on the imposition of multiple enhancements. The sentencing judge must impose sentence for the aggregate term of imprisonment computed without reference to those prohibitions and limitations, and must thereupon stay execution of so much of the term as is prohibited or exceeds the applicable limit. The stay will become permanent on the defendant's service of the portion of the sentence not stayed."

*v. Yim* (2007) 152 Cal.App.4th 366, 369; *People v. Lamb* (1988) 206 Cal.App.3d 397, 401; see Rule 4.420(b) [trial court is not limited by the aggravating factors listed in the court rules, but may rely on "any other factor reasonably related to the sentencing decision"].)  The trial court's articulation of several aggravating factors for choosing to impose consecutive terms on the substantive offenses and an upper term on the stayed firearm enhancement did not exceed "the bounds of reason, all of the circumstances being considered." (*People v. Giminez* (1975) 14 Cal.3d 68, 72.)  We are confident that if we remanded the matter for resentencing, the trial court would impose the same sentences without relying on any purported use of the same aggravating factors.  (See *People v. Osband* (1996) 13 Cal.4th 622, 732; *People v. Douglas* (1995) 36 Cal.App.4th 1681, 1691.)[25]

### E.    Presentence Conduct Credit on Prior Drug Conviction

At the time of his arrest on November 28, 2008, defendant was out of custody on probation in "revoked status" on a prior drug conviction.  While in custody on the November 28, 2008, offenses, defendant was concurrently in custody based on a violation of probation petition filed in the drug conviction case.  After the jury returned its verdict on the November 28, 2008, offenses, the trial court found defendant had violated his probationary term imposed on the prior drug conviction.

On January 14, 2011, the court sentenced defendant on the convictions resulting from the November 28, 2008, offenses and his prior drug conviction.  For his prior drug conviction, the court calculated defendant's presentence credit under section 4019 that was in effect before January 25, 2010, which gave one-third time off – for every four days actually served, six days were deemed served. Thus, defendant was awarded 1,272 days on the probation violation case: 848 actual days plus 424 days for conduct credit.

On appeal defendant argues he is entitled to an additional 424 days conduct credit for time served from November 28, 2008 until January 14, 2011 for the prior drug

---

[25]    In light of our determination, we need not address defendant's claim that his trial counsel was ineffective for failing to object to the purported dual use of sentencing factors.

conviction, pursuant to former section 4019, subdivision (g), which became operative on January 25, 2010. (Stats. 2009-2010, ch. 28 (Third Extra. Sess.), § 50.)[26] Under that amended law, a defendant was entitled to receive one day of conduct credit for every day of actual custody. (*Ibid.*) [27] However, since the filing of the briefs in this case, our Supreme Court has concluded the January 25, 2010 amendment to section 4019 should be applied prospectively only. (*People v. Brown* (2012) 54 Cal.4th 314, 318.) "To apply former section 4019 prospectively necessarily means that prisoners whose custody overlapped the statute's operative date (Jan. 25, 2010) earned credit at two different rates." (*Brown, supra*, at p. 322.) Because defendant's presentence conduct credit on the prior drug conviction overlapped former section 4019's operative date (January 25, 2010), we will remand the matter to the trial court to recalculate the award of presentence conduct credit on that case: for the period from November 28, 2008 to January 24, 2010, the court should apply the pre-January 25, 2010 version of section 4019, and for the period from January 25, 2010 to January 14, 2011, the court should apply the January 25, 2010 version of section 4019.

---

[26] The Attorney General argues defendant is not entitled to the benefit of the statutory amendment effective January 25, 2010, because he was sentenced on "January 14, 2010." However, as noted in the text, defendant was not sentenced until January 14, *2011*, after the operative date of the January 25, 2010 statutory amendment.

[27] On September 28, 2010, the Legislature further amended the statute to restore the original, lower credit-earning rate. (Stats. 2010, ch. 426, § 2.) However, "[b]y its express terms newly created subdivision (g) of section 4019 declared the September 28, 2010 amendment applied only to prisoners confined for a crime committed on or after the effective date of that amendment. (§ 4019, subd. (g).)" (*Payton v. Superior Court* (2011) 202 Cal.App.4th 1187, 1190, fn. 3.) Thereafter, the Legislature amended the statute yet again to raise the rate, and again the new amended rate applied only to prisoners confined for a crime committed on or after July 1, 2011, the operative date of that amendment. (Stats. 2011, ch. 15, §§ 482, 639.) The new amendments do not affect defendant's claim for presentence conduct credit.

# DISPOSITION

The matter is remanded to the trial court for a recalculation of the award of presentence conduct credit consistent with this opinion. In all other respects, the judgment is affirmed.

_____
Jenkins, J.

We concur:


_____
McGuiness, P. J.


_____
Siggins, J.